1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| MIGUEL RODRIGUEZ GALLARZO,<br><br>                                        Petitioner,<br><br>            vs.<br><br>AMY MILLER, Warden,<br><br>                                        Respondent. | Civil          15cv1226-DMS (BGS)<br>No.<br><br>**REPORT AND RECOMMENDATION**<br>**OF UNITED STATES MAGISTRATE**<br>**JUDGE RE DENIAL OF PETITION**<br>**FOR A WRIT OF HABEAS CORPUS** |

17       This Report and Recommendation is submitted to United States District Judge

18   Dana M. Sabraw pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the

19   United States District Court for the Southern District of California.

20                                              **I.**

21                              **FEDERAL PROCEEDINGS**

22       Miguel Rodriguez Gallarzo (hereinafter "Petitioner"), is a California prisoner

23   proceeding pro se with a Petition for a Writ of Habeas Corpus pursuant to

24   28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner challenges his San Diego County Superior

25   Court convictions on nine counts of committing forcible lewd acts upon a child and one

26   count of committing a lewd act upon a child, accompanied by jury findings he had

27   substantial sexual contact with multiple victims under the age of fourteen, for which he

28

was sentenced to 180 years-to-life in state prison.  (Pet. at 1-2.[1])  Petitioner alleges here that his federal Constitutional rights were violated because there is insufficient evidence to support his convictions (claim one), the exclusion of a proffered defense expert witness on the reliability of child sexual abuse reporting deprived him of his rights to a fair trial and to present a defense (claim two), and he received ineffective assistance of counsel because his trial counsel failed to conduct an adequate investigation, present witnesses, prepare for trial, or present a defense (claim three).  (Id. at 8-24.)

Respondent has filed an Answer and has lodged the state court record.  (ECF Nos. 7-8.)  Respondent contends habeas relief is not available because claims one and two are procedurally defaulted, all claims are without merit, and the state court adjudication of claims two and three is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Ans. at 2; Memorandum of P&A in Support of Answer ["Ans. Mem."] at 9-19.)  Petitioner has filed a Traverse, in which he requests an evidentiary hearing.  (ECF No. 9.)

For the following reasons, the Court finds Respondent has failed to show any claim is procedurally defaulted, and an evidentiary hearing is neither necessary nor warranted. The Court finds federal habeas relief is unavailable because Claims 1 and 3 are without merit under a de novo review, and because the adjudication of Claim 2 by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, the Court **RECOMMENDS** the Petition be **DENIED**.

///

///

///

///

---

[1] Pleading citations are to pages assigned by the Court's Electronic Case Filing ("ECF") system.

15cv1226

## II.

## STATE PROCEEDINGS

In a ten-count Amended Information filed in the San Diego County Superior Court on October 11, 2012, Petitioner was charged with nine counts of committing a forcible lewd act upon a child in violation of California Penal Code section 288(b)(1), and one count of committing a lewd act upon a child in violation of Penal Code section 288(a). (Lodgment No. 1, Clerk's Tr. ["CT"] at 16-24.) The amended information contained sentence enhancement allegations that the offenses involved substantial sexual contact with multiple victims under fourteen years of age within the meaning of Penal Code sections 1203.066(a)(7)-(8) and 667.61(b)(c)(e). (Id.)

On October 23, 2012, a jury found Petitioner guilty on all counts and returned true findings on all the sentence enhancement allegations. (CT 60-92.) On February 6, 2013, he was sentenced to 180 years-to-life in state prison. (CT 176-78.)

On October 22, 2013, Petitioner appealed, raising Claim 2 here. (Lodgment Nos. 3-4.) The appellate court affirmed. (Lodgment No. 5, People v. Gallarzo, No. D063434, slip op. (Cal.Ct.App. June 30, 2014).) On August 2, 2014, he filed a petition for review in the state supreme court presenting the same claim. (Lodgment No. 6.) The petition was denied by an order which stated: "The petition for review is denied." (Lodgment No. 10, People v. Gallarzo, No. S220390, order at 1 (Cal. Sept. 15, 2014).)

On February 13, 2015, Petitioner filed a pro se habeas petition in the state supreme court presenting all three claims raised here. (Lodgment No. 8.) The petition was denied with an order which stated: "The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Lindley* (1947) 29 Cal.2d 709, 723; *In re Swain* (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 9, In re Gallarzo, No. S224418, Order at 1 (Cal. April 22, 2015).)

///

///

# III.

## TRIAL COURT PROCEEDINGS

A.C., 24 years old at the time of the trial, testified that she has lived in Tijuana, Mexico, for her entire life, and that Petitioner is her uncle.[2] (Lodgment No. 2, Reporter's Tr. ["RT"] at 77.)  Magdalena Hernandez is A.C.'s mother, and Petitioner is married to Magdalena's sister, Berta Gallarzo. (RT 78.)  A.C. said her family has always been very close to Petitioner's family, and that she often visited Petitioner's house, where there have been frequent family gatherings.  (RT 78-79.)  Magdalena has another sister, Carmine Gaxiola, who has a daughter, A.C.'s cousin Karla, who has a daughter C.O., one of the victims here; Carmine has another daughter, A.C.'s cousin Claudia, who has a daughter P.C., another victim in this case.  A.C. testified that when Karla, C.O.'s mother, told A.C. that C.O. had been taken to the police with allegations against Petitioner, A.C. thought the police could handle that situation without A.C.'s involvement.  (RT 79-80.)  A.C. said she only decided to come forward with information about her history with Petitioner when Karla told her P.C. was also involved.  (Id.)

A.C. testified that when she was between six and seven years old it was very common for her to stay overnight at Petitioner's house during her vacations.  (RT 82.)  On several occasions Petitioner told her to sleep in his bed, but she always refused and slept with her cousins.  (Id.)  When she was between six and nine years old Petitioner started to ask her to take a shower, even though she had already showered earlier in the day, and she always refused Petitioner's requests.  (RT 81-85.)  For a few years when she was nine or ten he started to give her money, five or six dollars at a time, to buy things she wanted, and became more insistent that she lie down on his bed with him.  (RT 85.)  She said there were times when Petitioner would tickle her in what she felt was an inappropriate manner, and that she stopped taking money from him when she was twelve

---

[2]  Petitioner was not charged with any offenses regarding A.C., but her testimony was admitted as propensity evidence regarding the charged offenses against three victims who were under fourteen years of age at the time of the offenses, Y.H. (counts 1-2), C.O. (count 3), and P.C. (counts 4-10).

15cv1226

or thirteen because she felt that was inappropriate.  (RT 85-87.)  She stopped speaking to Petitioner after that, and nothing happened again until she was about seventeen or eighteen.  (RT 88.)  She was staying overnight at Petitioner's house in a bedroom by herself around that time and had locked the door, which was easy to open with a knife when locked, and awoke to see Petitioner standing next to her, rubbing her leg and masturbating.  (Id.)  She told him to leave and that if he came back she would tell her aunt Berta, Petitioner's wife.  (RT 90.)  After that incident she refused to allow anything like that to happen again.  (Id.)

A.C. said she is about three years older than her cousin's daughter P.C., and she organized a shower for P.C. when she got married.  (RT 91-92.)  The day before the shower A.C. was at Petitioner's house cooking when Petitioner entered the kitchen and told her: "I always felt like I was the big cheese, that I always would come to his house and not talk to anyone or say - even come out.  And what I really needed was 'a man to make me a woman, so that would go away,' so that I would not have that attitude anymore; that he was the man that was going to do that so I would not have that attitude."  (RT 92.)  A.C. ignored Petitioner and he left the kitchen.  (RT 93.)

Carmine Gaxiola testified that her daughter Karla has a daughter, C.O., and that Petitioner is married to Carmine's sister Berta.  (RT 139-41.)  On August 26, 2011, Carmine brought her then four-year-old granddaughter C.O. to Berta and Petitioner's house.  (RT 141.)  C.O. sat next to Carmine in the garage that day as Carmine sewed.  (Id.)  At one point Carmine noticed C.O. had left, and went to look for her.  (RT 144.)  She opened the door to a bedroom and saw Petitioner and C.O. sitting on a bed with their backs to her.  (RT 145-46.)  C.O. was wearing a dress and Petitioner was bending at the waist and appeared to be touching C.O. in the area of her knees, and Carmine "imagined the worst."  (RT 146-52.)  Carmine yelled at Petitioner and asked him what he was doing to the child.  (RT 153.)  Petitioner got up and said he was putting on her shoes, but in Carmine's experience C.O. was able to dress herself and always put on her own shoes.  (RT 153.)  When Carmine asked C.O. what she was doing, she stood up, replied: "I don't

know," and quickly left the room.  (RT 154.)  Berta then entered the room, and Carmine told Berta that Petitioner had done something to C.O.  (Id.)  Carmine testified that she had not actually seen anything inappropriate happen, but had merely imagined that something inappropriate had happened.  (RT 155.)  Carmine went back to the garage, resumed sewing with C.O. sitting next to her, and said C.O. did not seem upset.  (RT 156.)  Carmine did not ask C.O. what had happened because she did not want to upset the girl, and wanted to wait for C.O.'s mother Karla to get home before deciding how to handle the situation.  (RT 157.)

Carmine said Berta then joined them in the garage and began sewing.  (RT 159.)  About twenty minutes later Petitioner came in the garage and told Carmine to leave.  (Id.)  When she refused to leave, Petitioner threatened to call the police, and when Carmine told him to go ahead and do so, he tried to hit her.  (RT 160.)  Berta intervened and ordered Petitioner out of the house.  (Id.)  Carmine and C.O. went home, where they lived with Karla and her husband, but Carmine decided to waited until morning to tell Karla about what happened because she was not sure how Karla's husband would react toward Petitioner.  (RT 161.)

Carmine testified that the next day her daughter Karla told her: "Mom, something happened between the little girl and my uncle, because she told me something."  (RT 163.)  Carmine told Karla to call Berta, and immediately after that call Carmine and Karla decided to go to the police.  (RT 164.)  On the way to the police station, C.O. demonstrated to them what Petitioner had done to her by touching herself on the crotch underneath her clothing, and said "he touched my colita with his fingers."  (RT 166-67.)  Carmine said that in their family colita refers to private parts, but not necessarily either the front or back.  (RT 166.)  During the police interview, Carmine told the police that a friend of hers had told her that Petitioner had molested her friend's granddaughter Y.H.  (RT 169.)  Carmine called her other granddaughter P.C. (Carmine's daughter Claudia's child), who was then an adult but who had spent a lot of time at Petitioner's house when she was young, and asked her if Petitioner had ever tried to do something with her.  (RT

169-70.)  P.C. began crying and said Petitioner had done something to her, and P.C. agreed to go to the police when Carmine told her that C.O. had said Petitioner had touched her.  (RT 170-71.)

On cross-examination, Carmine said she had always been very close with her sister Berta, but that changed when Carmine testified at the preliminary hearing in this case, and since then they stopped speaking to each other.  (RT 143.)  Carmine said she never found out what she did at the preliminary hearing to upset Berta, but denied the rift was because Berta had accused Carmine of lying at the preliminary hearing when Carmine said Petitioner had falsely accused her of cheating on her husband.  (RT 177-78.) Carmine said she had been raped by a stranger when she was about 26 years old and married, and that she had a child as a result of the rape which she gave up for adoption.[3] (RT 266-68.)

Karla O. testified that Carmine Gaxiola is her mother, that Petitioner is married to Carmine's sister Berta, and that Karla's daughter C.O. was born on December 7, 2006. (RT 285-86.)  On the morning of Saturday, August 27, 2011, Karla noticed that C.O. had a red mark on her arm.  (RT 288-89.)  Karla asked C.O. about the mark, and C.O. said: "I don't want to tell you, because it's something bad."  (RT 289.)  C.O. finally said: "It's because my uncle Miguel touched my colita," and C.O. demonstrated by cupping her vagina with her hand outside her clothing; Karla said she had taught C.O. that colita is a name for the vagina.  (RT 289-90.)

Later that morning they went to a swap meet where Karla asked her mother if she knew what had happened with regard to the mark on C.O.'s arm, and Carmine said

---

[3]  The defense strategy, as set forth in counsel's opening statement (RT 67-74) and closing argument (RT 672-92), was that a rift in the family was caused when Petitioner told Carmine's husband that Carmine was cheating on him and had become pregnant as a result of the affair. From that point on Petitioner and Carmine fought, even though Berta and Carmine got along well and worked together as seamstresses sewing in Petitioner and Berta's home.  But when Carmine denied at the preliminary hearing that she had an affair and called Petitioner a liar, Berta and Carmine had their falling out.  According to the defense, the family then lined up against Petitioner to exaggerate or manufacture evidence against him, as evidenced by A.C. and P.C. only coming forward with allegations after being told that C.O. had made similar allegations, which was made easier by the impressionability of the young victims.

something had happened the previous day.  (RT 291.)  Karla called Berta and asked what happened, and Berta said she would call back but never did.  (RT 291-92.)  Karla waited about an hour and decided to go to the police.  (RT 292.)  On the ride to the police station, C.O. put her hand on her vagina under her clothes to demonstrate how Petitioner had touched her, and said: "My uncle touched my colita, and that was not all right, that shouldn't be done."  (RT 294-95.)  After C.O. was interviewed at the police station she was taken to a hospital and examined.  (RT 296.)  Karla testified that C.O. was able to dress herself, including putting on shoes, and that on August 26 she had been wearing sandals with no buckles or straps.  (RT 297-301.)  While Karla was at the police station she told the police that Y.H.'s grandmother, a friend of the family, had said that about a year earlier something had happened to Y.H.  (RT 303.)  The police asked Karla if she could arrange for Y.H. to come to San Diego from her home in Tijuana; Y.H.'s mother agreed to allow Y.H. to speak to the police, and Karla picked Y.H. up from Tijuana that same day, brought to the police station, and then drove her back to Tijuana.  (RT 303-05.)

C.O., five years old and in kindergarten when she testified at trial in October 2012, said that the last time she went to Petitioner's house she was with her grandmother Carmine.  (RT 321-24.)  C.O. said she was in a bedroom playing with her little cousin, sitting on the bed, when Petitioner came in and began to help her put on her sandals.  (RT 325-26.)  After Petitioner put on her sandals he touched her vagina, over her clothes, while moving his fingers, and "asked me if I liked for someone to do that for me, and I said, 'No.'"  (RT 326-27.)  C.O. said that her grandmother came in at that point and said: "What are you doing to her?"  (RT 329.)  Petitioner replied "nothing," and C.O. ran out of the room with her grandmother.  (Id.)  C.O. testified she was able to put her sandals on by herself at that time.  (RT 331.)

P.C., twenty years old at the time of trial, testified that Petitioner is married to her aunt, and that when she was young she and her older brother Hector often spent time at Petitioner's house where they were babysat after school and during school vacations

while their parents were at work. (RT 338-41.) P.C. testified that when she was little, perhaps five or six years old, Petitioner often touched and licked her vagina and her chest, under her clothes, while holding her down. (RT 342-48.) They were always alone on those occasions, except one time when she was eight or nine her cousin Raul walked in on them when Petitioner was licking her chest. (RT 344-46.) P.C. said such things happened as many as 15 times a year between the ages of six and thirteen, and that she never told anyone. (RT 346-47.) She said the incidents would not last long and she would get away as fast as she could, which required kicking and pushing Petitioner, and that she was always forced to submit during those incidents and never participated voluntarily. (RT 348-49.)

P.C. said that as she got older, about fifteen or sixteen, and attended high school, she avoided going to Petitioner's house and would instead go to her friends' houses after school. (RT 349-50.) Once, around Christmas 2001, when she was eight or nine, Petitioner grabbed her, forced her on to a bed, touched her vagina with his hands, unzipped his pants, took out his penis, and attempted to put his penis in her vagina; she could feel his penis touching her vagina but was able to fight him off before penetration. (RT 352-54.) She said Petitioner occasionally offered her money, five or ten dollars at a time, which she would grab and run away with. (RT 354.) As she got older, Petitioner began making "nasty comments" about her breasts and buttocks. (RT 356.) She said she decided to come forward after her grandmother told her that something similar happened to C.O. (RT 358.)

A recording of C.O.'s August 31, 2011, police interview was played for the jury. (RT 370-71.) During the interview, C.O. said that she and her cousin A.J. were playing in a room when Petitioner unbuttoned the shorts she was wearing and began "massaging" her "private" with his finger underneath her underwear. (Lodgment No. 3 at 10.) She told the interviewer that Petitioner asked her if she wanted him to do that to her and she told him "no"; she told the interviewer that she told Petitioner to stop but he did not stop

until her grandmother came in and asked Petitioner: "What are you doing to the little girl?" (Id.)

Y.H., fourteen years old at the time of trial, testified that Petitioner is the husband of a friend of her grandmother. (RT 375-76.)  Y.H. said she had been to Petitioner's house only once, about a year before trial, to help her grandmother with a yard sale, although she had met Petitioner and his wife many times before. (RT 376-77.)  Y.H. testified that she and her six-year old cousin V.C. went into the house, saw Petitioner on the couch, asked him where the bathroom was, and Petitioner pointed the way and asked if they wanted him to come with them. (RT 378-79.)  Y.H. told him no, and she helped V.C. use the bathroom. (RT 379.)  When they came out Y.H. asked Petitioner for something to drink; as Petitioner poured her a drink of juice, he asked her if she had a boyfriend, told her she was "really pretty" and "said I was well developed," which made Y.H. feel harassed. (Id.)  Petitioner began caressing her arms and shoulders while standing behind her, and she responded by trying to push his hands off. (RT 380-84.) She tried three or four times to get Petitioner to release her but was unsuccessful. (RT 384.)  Petitioner lowered his hands and moved them to her front, just above her breasts. (RT 385.)  She moved to the side and he released her; as she walked away toward the door, Petitioner grabbed her arm and told her she should stay and watch television with him. (RT 385-86.)  She pulled her arm away, told him she did not want to stay with him, and tried to leave but the door would not open. (RT 387.)  Petitioner told her not to leave, but she eventually opened the door and took V.C., whose hand she had been holding the entire time, outside, where Y.H. told her grandmother what had happened. (RT 387-88.)

V.C., seven years old at the time of trial, testified that on one occasion she went to a yard sale with her cousin Y.H. (RT 407-09.)  They went inside to get a drink, and as they were leaving, the man who had given them a drink grabbed Y.H., hugged her from behind, draped his arms over her chest and squeezed. (RT 409-12.)  V.C. said the man took his hands off Y.H. when Y.H. became angry, and Y.H. told her grandmother what had happened. (RT 412.)

15cv1226

Richard Calixto, a National City Police Officer, testified that he interviewed Carmine Gaxiola on August 27, 2011, and recorded the interview.  (RT 418-20.) Carmine told Officer Calixto that when she had confronted Petitioner the previous day she thought Petitioner was going to hit her.  (RT 420.)  The People rested.  (RT 425.)

Prior to trial the defense made a motion for introduction of expert witness testimony on the issue of child suggestibility. (CT 148-61.)  As discussed in detail below in Claim 2, the trial judge denied the motion on the basis that the proffered expert testimony would not assist the jury.  (RT 42.)

A.J., four years old at the time of trial, testified that Petitioner is his grandfather. (RT 426.)  The last time A.J. saw Petitioner was when A.J. and his cousin C.O. were playing in a room in Petitioner's house.  (RT 432-33.)  Petitioner entered the room and told A.J. to put his shoes on.  (RT 434.)  A.J. said Petitioner was helping C.O. put her sandals on when C.O.'s grandmother came in and began screaming at Petitioner.  (RT 436-42.)

Berta Gallarzo, Petitioner's wife, testified that she is a seamstress who works out of the garage at the home she shares with Petitioner, and that over the years she has often taken care of the children of her relatives while their parents were working.  (RT 448-50.) Berta said Petitioner knew her sister Carmine before he met Berta, and he got along well with Carmine when he was sober.  (RT 466.)  Berta said Petitioner suffers from alcoholism and is often aggressive with Carmine when intoxicated, and Berta always intervened to protect Carmine on those occasions.  (RT 466-67.)  Berta said Petitioner was not usually a very physical person, but when he drank he would hug and touch everyone, trying to be nice, and massage people's shoulders, but always in a non-sexual way.  (RT 470-71.)  She never saw anything inappropriate between Petitioner and any of her relatives.  (RT 474-75.)  When asked if Petitioner was the type of person who was capable of doing what he had been accused of, Berta said: "I can't say if he is the kind of man that would do something like that, but like I said before, when a man drinks, and he's not in a right mind, I don't know."  (RT 520-21.)  Berta said she had always gotten

along well with her sister Carmine, but that changed when Berta asked Carmine why she had lied at the preliminary hearing when she denied having had an affair, and when she said Petitioner had tried to hit her on August 26, 2011. (RT 468-69, 522-23.)

Joanna Gallarzo, twenty-eight years old at trial, testified that Petitioner is her father. (RT 574.) She said Petitioner was a loving father while she and her siblings were growing up, and took an active interest in their well-being. (RT 576.) She never felt uncomfortable with him, and said she often had female friends over to visit and was never aware they felt uncomfortable with him. (RT 578.) Although Petitioner drank beer after work and on the weekends when she was growing up, he never had a problem with alcohol. (RT 577.) About two years before trial, however, Petitioner was laid off his job and fell into a depression and started drinking more. (RT 578.) Joanna said that Petitioner loved his grandchildren and they love him. (RT 579.) She moved out about nine years before trial, but visits her mother and father almost every day because she wants to remain close to her family, and because she drops her son off at their house for babysitting. (RT 580-81.)

Joanna testified that she never saw Petitioner acting inappropriately with P.C. or A.C., and never saw them acting as if they were uncomfortable around Petitioner. (RT 581-83.) In Joanna's opinion, P.C. often lied, missed a lot of school, and was not a serious person. (RT 584-85.) She said she did not think Petitioner would have done the things he was accused of, and did not believe his accusers were telling the truth. (RT 588, 591.) The defense rested and there was no rebuttal. (RT 604.)

After deliberating about three and one-half hours, the jury returned guilty verdicts on all counts. (CT 224-25; RT 705-13.) Petitioner was found guilty on nine counts of committing a forcible lewd act on a child based on contact with Y.H.'s shoulders (counts 1-2), and P.C.'s vagina (counts 4-10); and one count of committing a lewd act on a child based on contact with C.O.'s vagina (count 3). (RT 707-13.) The jury found Petitioner had substantial sexual contact with a child under the age of fourteen within the meaning of Penal Code section 1203.066(a)(8) as to counts three through ten; that he had been

convicted of committing an offense upon more than one victim in the present case within the meaning of Penal Code sections 667.61(b)(c)(e) and 1203.066(a)(7) as to all counts; and that he had been convicted of committing an offense upon a victim under the age of fourteen years of age and against more than one victim in the present case within the meaning of Penal Code section 667.61(j)(2) as to counts one through three.  (Id.)  He was sentenced to consecutive terms of twenty-five years-to-life each on counts one through three, and consecutive terms of fifteen years-to-life each on counts four through ten, for a total of 180 years-to-life in state prison.  (RT 726-27.)

## IV.

## PETITIONER'S CLAIMS

(1)  Petitioner's federal Constitutional right to due process was violated because insufficient evidence was presented at trial to convict him on all counts.  (Pet. at 6-10.)

(2)  Petitioner's federal Constitutional rights to a fair trial and to present a defense were violated by the exclusion of the proffered defense expert witness on child sexual abuse victim suggestibility.  (Pet. at 11-14.)

(3)  Petitioner's federal Constitutional right to the effective assistance of counsel was violated by trial counsel's failure to conduct an adequate pre-trial investigation, present witnesses, prepare for trial, and present a defense.  (Pet. at 15-18.)

## V.

## DISCUSSION

For the following reasons, the Court finds Respondent has failed to carry the burden of demonstrating any claim is procedurally defaulted, and that an evidentiary hearing is neither necessary nor warranted.  The Court finds habeas relief is unavailable because Claims 1 and 3 are without merit under a de novo review, and because the adjudication of Claim 2 by the state court is objectively reasonable within the meaning of 28 U.S.C. § 2254(d).  The Court **RECOMMENDS** the Petition be **DENIED**.

///

///

**A.     Standard of Review.**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to claims which were adjudicated on their merits in the state court, that a petitioner must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if the petitioner can satisfy § 2254(d), or show it does not apply, he must still demonstrate that a federal constitutional violation occurred in order to obtain federal habeas relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application

must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).  Clearly established federal law "refers to the holdings, as opposed to the dicta," of United States Supreme Court decisions at the "time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412.  To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon which the state court adjudication rests, assuming it rests upon a determination of the facts, are objectively unreasonable. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

When a federal habeas court addresses the merits of a claim which has not been adjudicated on the merits in state court, pre-AEDPA de novo review is required. <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167-68 (9th Cir. 2002).  Under such a review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." <u>Hayes v. Brown</u>, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).

**B.    Claim 1**

Petitioner contends in Claim 1 that his federal Constitutional right to due process was denied because there is insufficient evidence of his guilt on any count.  (Pet. at 6-10.) Respondent answers that Claim 1 is procedurally defaulted, and, alternately, is entirely without merit.  (Ans. Mem. at 9-11.)

**a)  Procedural Default**

In order to preclude federal review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to forever bar federal review. <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 (1991).  To be "independent" the state law basis for the decision must not be interwoven with federal law. <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983).  In order to be "adequate," the state procedural bar must be "clear, consistently applied, and well-established at the time

of the petitioner's purported default." <u>Calderon v. Bean</u>, 96 F.3d 1126, 1129 (9th Cir. 1996).

Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review. <u>Bennett v. Mueller</u>, 322 F.3d 573, 586 (9th Cir. 2003). The burden then shifts to Petitioner to challenge the independence or adequacy of the procedural bar. <u>Id.</u> If Petitioner makes a sufficient showing, then the ultimate burden of proof falls on Respondent. <u>Id.</u>

Petitioner presented Claim 1 to the state supreme court in a habeas petition, which also included Claims 2-3 raised here. (Lodgment No. 8.) The petition was denied in an order which stated: "The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Lindley* (1947) 29 Cal.2d 709, 723; *In re Swain* (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 9, <u>In re Gallarzo</u>, No. S224418, Order at 1.)

Respondent argues that the citation to <u>Lindley</u> by the state supreme court indicates Claim 1 was denied on the basis of a state procedural rule which requires sufficiency of the evidence claims to be presented on direct appeal rather than habeas, and that the Ninth Circuit has recognized that rule to be adequate and independent so as to support a federal procedural default. (Ans. Mem. at 10-11.) However, a state court order which denies numerous claims with citations to numerous procedural bars, but which is ambiguous as to which bars apply to which claims, does not support a procedural default unless all the procedural bars are adequate and independent. <u>Koerner v. Grigas</u>, 328 F.3d 1039, 1051-54 (9th Cir. 2003). Respondent makes no effort to demonstrate that all of the procedural bars identified by the state supreme court are adequate and independent. Respondent has therefore failed to carry the initial burden of demonstrating Claim 1 is procedurally defaulted. <u>Id.</u>; <u>Bennett</u>, 322 F.3d at 586.

Because there is no indication the state court adjudicated Claim 1 on the merits, and every indication that it was denied based on one or more of the procedural bars identified by the state supreme court, and because Respondent has not demonstrated the

claim is procedurally defaulted, the Court will address the merits of the claim under a de novo review.  Pirtle, 313 F.3d at 1167-68; Hayes, 399 F.3d at 978 (holding that under a de novo standard of review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution.")

**b) Merits**

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979).

As outlined above in Section III of this Report, each victim (Y.H. with respect to counts 1-2, C.O. with respect to count 3, and P.C. with respect to counts 4-10), testified at trial that Petitioner committed the charged offenses against them.  Y.H.'s testimony is directly corroborated by the testimony of V.C., who testified at trial that she witnessed the incident between Y.H. and Petitioner.  All of the victims' testimony is indirectly corroborated by the testimony of A.C., who testified that Petitioner behaved or attempted to behave in a similar manner toward her when she was a child.

Rather than argue that the acts Petitioner performed on the victims do not satisfy the elements of the offenses, which Petitioner appears to recognize would be pointless, Petitioner asks this Court to reweigh the evidence presented at his trial.  (Traverse at 8.) He argues here, as he did before the jury, that the adults contrived to manufacture the victims' testimony based on family animosity toward him.  (Pet. at 6-10; Traverse at 8-9, 12-13.)  Petitioner is not entitled to a reweighing of the evidence or the credibility of the witnesses in this Court.  See Coleman v. Johnson, 566 U.S. ___, 132 S.Ct. 2060, 2065

(2012) ("The jury in this case was convinced, and the only question under <u>Jackson</u> is whether that finding was so insupportable as to fall below the threshold of bare rationality."); <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995) ("under <u>Jackson</u>, the assessment of the credibility of witnesses is generally beyond the scope of review.")  Petitioner has not shown that his federal due process rights were violated due to insufficient evidence, because his victims provided direct evidence of the offenses through their trial testimony, which was corroborated.  He has failed to show that based on the "evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  <u>Jackson</u>, 443 U.S. at 324.

Petitioner requests an evidentiary hearing in order to develop facts supporting his defense that his family fabricated or exaggerated the allegations against him.  (Traverse at 10.)  An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief.  <u>Campbell v. Wood</u>, 18 F.3d 662, 679 (9th Cir. 1994); <u>see also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) ("It follows that if the record . . . precludes habeas relief, a district court is not required to hold an evidentiary hearing.")

The Court finds Respondent has not carried the burden of demonstrating Claim 1 is procedurally defaulted, that an evidentiary hearing is neither necessary nor warranted, and that Claim 1 fails under a de novo review.  The Court therefore recommends habeas relief be denied as to Claim 1.

## C.     Claim 2

Petitioner alleges in Claim 2 that his federal Constitutional rights to a fair trial and to present a defense were violated by the exclusion of a proposed defense expert witness, Dr. Mitchell L. Eisen, Ph.D.  (Pet. at 11-14.)  The defense proffered at trial that Dr. Eisen was prepared to testify on suggestive interview techniques, false memory creation in adolescents and adults, stereotype induction, coaching, language abilities, and Child Sexual Accommodation Syndrome, as well as to "help rebut the myth that children never

lie about sexual matters and will offer an alternative innocent explanation for the child witness's version of the events." (CT 151, 158-59.) Petitioner contends his defense was based on showing that vindictive family members caused exaggeration and manipulation of the evidence, and the exclusion of Dr. Eisen's testimony prevented him from challenging "the fact that he knew that the [witnesses were] lying." (Pet. at 13.)

Respondent answers that to the extent Petitioner merely argues that the trial court failed to properly exercise its discretion under state law to admit the proffered expert testimony, the claim is not cognizable on federal habeas. (Ans. Mem. at 12.) Respondent alternately contends the claim is procedurally defaulted, and the state court adjudication is objectively reasonable within the meaning of 28 U.S.C. § 2254(d). (Id. at 12-16; Ans. at 2.)

Petitioner presented this claim to the state supreme court in his petition for review. (Lodgment No. 6.) The state supreme court summarily denied the petition without citation of authority or a statement of reasoning. (Lodgment No. 7.) Petitioner also presented the claim to the appellate court on direct review. (Lodgment No. 3.) The appellate court denied the claim in a reasoned opinion. (Lodgment No. 5.) There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The appellate court stated:

On appeal, Gallarzo contends that all three victims did not complain of Gallarzo's misconduct voluntarily: C.O. was first questioned by Carmine, and P.C., and Y.H. only went to the police after being told of the incident involving C.O. In other words, Gallarzo submits that each of the witnesses was led to believe that if she did not come forward, she allegedly would be putting other victims at risk.

Gallarzo therefore contends the court violated his due process rights when it refused to admit the expert testimony of Dr. Eisen because Dr. Eisen's testimony would have helped the jury understand how the reliability of each of these victims was potentially compromised by allegedly improper and repeated interviewing techniques and stereotype induction. Gallarzo further contends the prosecution was permitted to introduce hearsay evidence in the form of statements by C.O., which was improper without Dr. Eisen's testimony regarding the suggestive nature of questioning and events leading up to the hearsay.

A. *Guiding Principles*

We review the trial court's decision to exclude expert witness testimony for abuse of discretion. (See *People v. McDonald* (1984) 37 Cal.3d 351, 373 (*McDonald*) ("where expert opinion evidence is offered, much must be left to the discretion of the trial court"), overruled on another ground as stated in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) However, such discretion is not unlimited. (*McDonald*, at p. 373.) Due process rights under the U.S. Constitution, and the right to a fair trial are violated when the trial court excludes "relevant evidence of significant probative value to (the) defense." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684-685; cf. *California v. Trombetta* (1984) 467 U.S. 479, 485.)

"If a witness is testifying as an expert, his (or her) testimony in the form of an opinion is limited to such an opinion as is . . . (r)elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801 subd. (a).) Thus, if nothing about the proposed testimony is sufficiently beyond common knowledge, such testimony is properly excluded. (See *McDonald, supra*, 37 Cal.3d at p. 365; see also *Easton v. Strassburger* (1984) 152 Cal.App.3d 90, 106 (noting that "'(t)he correct rule on the necessity of expert testimony has been summarized by Bob Dylan: "You don't need a weatherman to know which way the wind blows"'").)

In *McDonald*, our Supreme Court held the expert's proffered testimony was beyond the common knowledge of the jurors, and hence useful to the jury. (*McDonald, supra*, 37 Cal.3d at p. 375.) The expert in *McDonald* proposed to testify on the unreliability of eyewitness identification. (*Ibid.*) The court stated that the "eyewitness identification of the defendant (was) a key element of the prosecution's case but (was) not substantially corroborated by evidence giving it independent reliability, and the defendant offer(ed) qualified expert testimony on . . . factors shown by the record . . . not likely to be fully known to or understood by the jury." (*Id.* at p. 377.) Hence, the court ruled it was error to exclude such testimony. (*Ibid.*)

The *McDonald* court also cautioned that the labeling of psychological expert testimony as "'(usurpation of) the function" of the jury" or "'(invasions of) the province of the jury'" whenever such testimony could potentially affect the jury's determination of a witness's credibility was unjustified. (*McDonald, supra*, 37 Cal.3d at p. 370, citing to 7 Wigmore on Evidence (Chadbourn rev. ed. 1978) § 1920, p. 18 & § 1921, p. 22.) It referred to such language as legal cliche that was "impracticable and misconceived," urging the court to consider instead if the testimony would be important and useful to the jury and perhaps necessary for a proper decision on a difficult issue. (*McDonald*, at p. 370.)

B. *Usefulness to the Jury of Proposed Expert Testimony*

In general, California courts have recognized that a "'"psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan

psychiatrists may cloud rather than clarify the issues; (and) the testimony may be distracting, time-consuming and costly.""'" (*People v. Alcala* (1992) 4 Cal.4th 742, 781-82.)

We recognize, as Gallarzo submits, that courts from other jurisdictions have allowed expert testimony similar to the proffered testimony here. (See, e.g., *State v. Sloan* (Mo.Ct.App. 1995) 912 S.W.2d 592, 597.) We also recognize, however, that other courts have excluded such proposed expert testimony. (See, e.g. *State v. Ellis* (Me.1996) 669 A.2d 752, 753-754.)

Gallarzo contends that *People v. Harlan* (1990) 222 Cal.App.3d 439 (*Harlan*) supports his position and suggests that expert testimony be allowed in cases involving child witnesses. The *Harlan* court stated that although "California law does not require corroboration of the testimony of a child sexual abuse victim," where the prosecution's case is based on uncorroborated evidence, expert testimony such as the testimony in *McDonald* may be more appropriate for the defense. (*Id*. at pp. 453-454 ("A defendant may, under current law, offer expert testimony to challenge the victim's testimony in appropriate cases, preserving the jury's right to make ultimate determinations on the credibility of the witnesses.").)

We conclude this statement from *Harlan* does not apply in our case. First, unlike the circumstances in *Harlan*, here the prosecution's case was based on evidence from at least three witnesses, at least one of whom was an adult at the time of the trial. [FN 2: See discussion *post*.]

Second, *Harlan* still allows for broad latitude in the trial court's discretion in admitting expert testimony. Here, the record shows the trial court properly exercised that discretion when it reviewed the literature associated with Dr. Eisen's testimony and then ruled to exclude that testimony.

In any event, the defense's purpose in attempting to introduce the proposed testimony in the instant case was not to explain to the jury that the witnesses had indeed been subject to improper interviewing techniques, but rather to "rebut the myth" that children do not lie about sexual abuse. The trial court found that such a misconception did *not* exist and thus there was no need to rebut it.

Indeed, in child abuse cases (as CALCRIM 330 suggests), the commonly held belief is that children are *less* credible witnesses. Several cases have dealt with expert testimony that seeks to bolster a child's credibility to rebut this common misconception and to explain away inconsistencies and delays in abuse reporting. (See, e.g. *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 (ruling the court did not abuse its discretion in admitting the testimony of an expert to explain delays in parental reporting); *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (allowing expert testimony for the limited purpose of disabusing a jury of misconceptions it might have about how a child reacts to a molestation)).

We also conclude Dr. Eisen's testimony was not required to assist the jury in evaluating the alleged hearsay statements (i.e., videotape of forensic interviews) of witness C.O. As mentioned, the record suggests Dr. Eisen was not going to testify that the forensic questioning was inappropriate and hence untrustworthy in this case; instead, his proposed testimony generally

-21-

dealt with rebutting the "myth," as noted, and/or the potential pitfalls of child-interviewing techniques. In any event, this alleged hearsay evidence was but a small portion of the prosecution's case, inasmuch as several witnesses - including C.O. herself - testified at trial regarding the molestations. (See *People v. Sanders* (1995) 11 Cal.4th 475, 510 (concluding that there was no undue prejudice in refusing to admit expert eyewitness testimony because the prosecution's case was independently strong).)

Because it would not have been useful to the jury, we conclude the trial court properly exercised its broad discretion when it ruled to exclude the proposed testimony of Dr. Eisen.

### C. *Significance of Excluded Testimony to Gallarzo's Defense*

Having held the court properly exercised its discretion when it ruled Dr. Eisen's proposed testimony would not assist the jury, it is unnecessary to resolve whether the exclusion of such evidence undercut Gallarzo's main line of defense. (See *McDonald*, *supra*, 37 Cal.3d at p. 376.) Nonetheless, we note that P.C. was an adult and Y.H. was 14 at the time of trial. Thus, we separately conclude the court did not err when it excluded the proposed testimony of Dr. Eisen at least with regard to the alleged myth of childhood suggestibility.

### D. *Due Process*

Finally, because the proposed testimony of Dr. Eisen was not useful to the jury, we also conclude the exclusion of such testimony did not deprive Gallarzo of the right to present a defense as guaranteed under the Sixth and Fourteenth Amendments. (See, e.g., *People v. San Nicolas* (2004) 34 Cal.4th 614, 661-662.)

(Lodgment No. 5, <u>Gallarzo</u>, No. D063434, slip op. at 5-11.)

Respondent states in the Answer, without analysis, that this claim is procedurally defaulted (Ans. at 2), and does not present any argument in support of that contention in the Memorandum of Points and Authorities supporting the Answer. (Ans. Mem. at 11-16.) Accordingly, the Court finds Respondent has failed to carry the initial burden of demonstrating Claim 2 is procedurally defaulted. <u>Bennett</u>, 322 F.3d at 586.

Respondent next contends that to the extent Petitioner is merely presenting a state-law challenge to the trial judge's exercise of discretion in excluding the expert, he has not stated a cognizable claim on federal habeas. (Ans. Mem. at 12.) Petitioner has clearly alleged, both here and in the state courts, that the exclusion of his proffered defense expert violated the Fifth Amendment's guarantee of due process and the Sixth Amendment's guarantee of a right to present a defense, as those rights apply to his state

trial through the Fourteenth Amendment.  (Pet. at 11-14; Lodgment No. 6 at 27-37; Lodgment No. 3 at 26-36.)  Moreover, irrespective of whether the trial court ruling excluding the expert witness was a correct application of California law, as Respondent contends, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.")

Nevertheless, claims based on state evidentiary rulings are not cognizable on federal habeas unless the admission or exclusion of the evidence was so prejudicial that it rendered a trial fundamentally unfair.  Estelle v. McGuire, 502 U.S. 62, 70-73 (1991); Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996).  The determination by the trial judge that the proffered expert testimony was irrelevant is entitled to deference in this Court.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.")

There has been no showing of fundamental unfairness arising from the exclusion of the proffered defense expert for several reasons.  First, as the state appellate court correctly noted, the testimony was not useful to the jury because it did not focus on the testifying witnesses, but merely offered an opinion on hypothetical potential pitfalls of interviewing child witnesses and in their testimony.  (Lodgment No. 5, Gallarzo, No. D063434, slip op. at 5-11) (reasoning that "the defense's purpose in attempting to introduce the proposed testimony in the instant case was not to explain to the jury that the witnesses had indeed been subject to improper interviewing techniques, but rather to 'rebut the myth' that children do not lie about sexual abuse.  The trial court found that such a misconception did *not* exist and thus there was no need to rebut it.").)

Secondly, the victims' testimony was corroborated, lessening any potential impact of expert evidence regarding suggestibility or fabrication.  Y.H.'s testimony was directly corroborated by V.C., who testified that she witnessed Petitioner touch Y.H. in a manner consistent with Y.H.'s testimony.  The testimony of all three victims was indirectly corroborated by the testimony of A.C. that when she was growing up Petitioner behaved toward her in a manner consistent with the allegations of his behavior toward the victims. Even Petitioner's wife of thirty years could not definitive say Petitioner was not the type of person who could commit the offenses.

Finally, even if the proffered expert could have been of marginal assistance to the jurors in evaluating the credibility of child sexual abuse victim reporting in general, the focus of the defense was on the alleged intentional fabrication and exaggeration by the adults, not the children.  C.O. was the only victim who was a child when she testified, and the only other child witnesses were V.C. and A.J., who were not victims.  Petitioner was able to support his defense theory through testimony regarding how A.C., P.C. and Y.H. were informed of C.O.'s accusations against Petitioner.  The defense showed that A.C. and P.C. only came forward with their allegations after they were told by the adults that others were making similar allegations, and that C.O.'s mother brought Y.H. from Tijuana to San Diego to be interviewed by the police.  The proffered expert testimony would not have aided the defense in its attempt to have the jury infer that A.C., P.C. and Y.H. were asked or pressured by the family to invent or exaggerate their testimony.

Considering the number of victims and their ages, and the corroboration of their testimony, the exclusion of expert opinion on hypothetical potential pitfalls of child sexual abuse victim suggestibility and reporting did not render the trial fundamentally unfair, and the appellate court therefore correctly found the exclusion did not deprive Petitioner of his federal due process rights.  Estelle, 502 U.S. at 70-73; Ortiz-Sandoval, 81 F.3d at 897.  The appellate court also correctly found that the exclusion of the expert testimony did not deprive Petitioner of his federal Constitutional right to present a defense.  (Lodgment No. 5, People v. Gallarzo, No. D063434, slip op. at 11) ("because

the proposed testimony of Dr. Eisen was not useful to the jury, we also conclude the exclusion of such testimony did not deprive Gallarzo of the right to present a defense as guaranteed under the Sixth and Fourteenth Amendments.")

The Supreme Court has stated that: "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 102-03 ("If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents.")  For the reasons set forth above, the Court finds that the state appellate court's adjudication of Claim 2 is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief.  <u>Campbell</u>, 18 F.3d at 679.  Furthermore, this Court must make its § 2254(d) determination based solely on the evidence presented to the state court.  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181-82 (2011).  The Court finds that an evidentiary hearing is neither necessary nor warranted.

Accordingly, the Court recommends habeas relief be denied as to Claim 2.

**D.    Claim 3**

Finally, Petitioner alleges he was denied his federal Constitutional right to the effective assistance of counsel by trial counsel's failure to conduct an investigation, present witnesses, prepare for trial, and present a defense. (Pet. at 15-18.)  For the most part the allegations in the Petition are generalized, such as Petitioner alleging counsel failed "to raise a crucial defense at trial" but without identifying that defense, and

alleging counsel failed to interview and call defense witnesses who "could have changed the outcome of the trial" but without identifying the witnesses.  (Id.)  He also alleges in a vague and conclusory manner that counsel should have obtained medical records of the victims, and that "defense counsel failed to get [an] expert's opinion as to [Petitioner's] character to commit the charged crimes, or an expert on DNA evidence, [or] an expert on sexual [sic] abused victims."  (Id. at 17.)

Respondent argues that the state supreme court's citation to the Duvall opinion in its order denying the state habeas petition in which this claim was raised is an indication that the state court found the claim to be without merit. (Ans. Mem. at 17.)  Respondent argues that because the claim is in fact without merit, the state court adjudication on that basis is objectively reasonable.  (Id. at 17-19.)

Petitioner replies that his trial counsel's lack of investigation prevented the presentation of witnesses who could have testified about the family animosity toward him, but he does not identify those witnesses, with one exception.  (Traverse at 10.) Petitioner says he told his counsel about P.C.'s brother Hector, who could have testified he was always with P.C. when they visited Petitioner and never saw anything inappropriate, but when Petitioner asked defense counsel about Hector, counsel said: "I called him but he did not answer the phone."  (Id. at 16.)

**a) Procedural Bar**

Petitioner presented Claim 3 to the state supreme court in a habeas petition, in which he also included Claims 1 and 2 raised here. (Lodgment No. 8.)  The petition was denied in an order which stated: "The petition for writ of habeas corpus is denied.  (See *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Lindley* (1947) 29 Cal.2d 709, 723; *In re Swain* (1949) 34 Cal.2d 300, 304.)"  (Lodgment No. 9, In re Gallarzo, No. S224418, Order at 1.)

Respondent contends the citation to Duvall is an indication the state supreme court found the claim to be meritless. (Ans. Mem. at 17.)  Respondent argues that the state

court adjudication is objectively reasonable because the claim is entirely without merit, as Petitioner has not alleged any specific facts demonstrating defense counsel was deficient in any manner. (Id. at 17-19.) Respondent acknowledges the possibility that the claim may be unexhausted, stating: "In the event the Court disagrees that the state court reached the merits of [Claim 3] and thus finds the claim unexhausted, Respondent submits that even under a de novo review, the claim is meritless." (Id. at 17, fn. 3.)

Page 474 of the Duvall opinion lists the pleading requirements for properly presenting a claim in a state habeas petition. Duvall, 9 Cal.4th at 474. A citation to this page of the Duvall opinion by the state court "may mean 'the available state remedies have not been exhausted as the California Supreme Court has not been given the required fair opportunity to correct the constitutional violation.'" Medley v. Runnels, 506 F.3d 857, 869 (9th Cir. 2007) (en banc) (Opinion of Ikuta, Circuit Judge, dissenting), quoting Harris v. Superior Court, 500 F.2d 1124, 1128 (9th Cir. 1974). In Medley, like here, Respondent did not expressly waive the exhaustion requirement, and the district court was therefore required to determine whether state court remedies still exist. See id. at 869, citing 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.")

The Court rejects Respondent's position that the citation to Duvall indicates the state court adjudicated Claim 3 on the merits within the meaning of 28 U.S.C. § 2254(d). First, it is unclear whether Duvall was applied to Claim 3, as the state supreme court did not indicate which citations were applied to which claims. Second, even if the state court order could be read as having applied Duvall to Claim 3, a Duvall citation apparently refers to a correctable procedural defect rather than an adjudication on the merits. See Pombrio v. Hense, 631 F.Supp.2d 1247, 1251-52 (C.D. Cal. 2009) (explaining that a Duvall citation points to a correctable defect). Thus, there is no indication in the record that the state court adjudicated Claim 3 on the merits within the meaning of 28 U.S.C. § 2254(d). See Richter, 562 U.S. at 99 ("When a federal claim has been presented to a state

court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits *in the absence of any indication or state-law procedural principles to the contrary*.") (emphasis added).  However, the Court need not resolve the issue for the following reasons.

Claim 3 was rejected by the California Supreme Court over eight months ago  (see Lodgment No. 9), and to the extent Petitioner once had an opportunity to return to state court and correct any defects in the claim, it appears the time has passed for him to do so, and state court remedies are no longer available with respect to this claim.  See Walker v. Martin, 562 U.S. 307, 311-321 (2011) (holding that California's timeliness requirement providing that a prisoner must seek habeas relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied).  Thus, irrespective of whether Petitioner properly presented Claim 3 to the state court in his state supreme court habeas petition, Petitioner has exhausted his state court remedies.  See Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him.")  Under such conditions, the claim is now technically exhausted and procedurally defaulted in this Court.  Coleman, 501 U.S. at 735 n.1 (holding that a procedural default arises when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); see id. at 729-30 (a procedural default arises from a violation of a state procedural rule which is independent of federal law, and which is clearly established and consistently applied.); see Bennett, 322 F.3d at 581 ("We conclude that because the California untimeliness rule is not interwoven with federal law, it is an independent state procedural ground.")

The Court may reach the merits of a procedurally defaulted claim if Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising

from the default, or that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim. <u>Coleman</u>, 501 U.S. at 750. The Court need not make a determination whether Petitioner could make a showing sufficient to excuse a default, or whether he has exhausted his state court remedies, because Claim 3 is clearly without merit. The Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002), citing <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be."); <u>see also</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") As set forth below, Claim 3 clearly fails on the merits under a de novo review. Accordingly, the Court finds that the interests of judicial economy support denying Claim 3 on the merits without making findings regarding whether the state court denied the claim on the merits or on procedural grounds.

**b) Merits**

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. <u>Id.</u> at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

1  Petitioner must establish both deficient performance and prejudice in order to establish

2  ineffective assistance of counsel.  Id. at 687.

3       Petitioner's allegation that his counsel presented no defense at all is clearly without

4  merit.  Defense counsel explained to the jury both during opening statements (RT 67-74)

5  and closing argument (RT 672-92), that the defense contended a rift in the family was

6  caused when Petitioner told Carmine's husband that Carmine was cheating on him and

7  became pregnant as a result of the affair, that from that point on Petitioner and Carmine

8  did not get along, and the family conspired to exaggerate or manufacture evidence against

9  Petitioner.  Evidence supporting that defense was brought out at trial through testimony

10  that A.C. only came forward with her years-old allegations against Petitioner after C.O.'s

11  grandmother Carmine told A.C. that C.O. had made similar allegations, and after C.O.'s

12  mother Karla told her that P.C. had made similar allegations.  It was also brought out at

13  trial that P.C. only came forward with her years-old allegations against Petitioner after

14  Carmine told her that something similar had happened to C.O., and it was brought out

15  that Karla went to Tijuana to bring Y.H. to the San Diego police after Carmine had

16  informed the police about Y.H.'s allegations against Petitioner.  Evidence as also

17  presented that Carmine had (falsely according to the defense) accused Petitioner of

18  attempting to hit her after Carmine confronted Petitioner with what she "imagined"

19  Petitioner had done to C.O.  Thus, evidence was presented to support the defense theory

20  that Carmine and Carmine's daughter Karla, C.O.'s mother, pressured or manipulated

21  A.C., P.C. and Y.H. to support C.O.'s allegations with fabricated or exaggerated

22  allegations.  Defense counsel also hired an expert witness on the reliability of child sexual

23  abuse reporting, but was prevented from presenting that evidence at trial.   Thus,

24  Petitioner has not alleged facts which, if true, show that his defense counsel presented no

25  defense, and this aspect of Claim 3 is entirely without merit.  See Strickland, 466 U.S. at

26  689 ("There are countless ways to provide effective assistance in any given case.  Even

27  the best criminal defense attorneys would not defend a particular client in the same

28  way.")

Petitioner also alleges defense counsel failed to conduct an investigation into, and present witnesses regarding, the family disharmony leading to their alleged invention and exaggeration of the allegations against him. The only witness Petitioner specifically identifies is P.C.'s brother Hector, who Petitioner contends "is in disagreement with the accusation because as he stated, every time they visited the Petitioner's house he was with his sister all the time, and that he never saw anything suspicious, or say [sic] his sister acted strange when she was around Petitioner." (Traverse at 16.) Petitioner states that when he asked defense counsel about Hector, counsel said: "I called him but he did not answer the phone." (Id.) As set forth above in Section III of this Report, P.C. testified to events which took place over a ten-year period, said that the abuse occurred as many as 15 times a year between the ages of six and thirteen, and that she and Petitioner were always alone during the incidents except one time. (RT 342-56.) Petitioner does not provide any evidence to support his conclusory allegation that Hector would have testified that he was always with P.C. when they were at Petitioner's house. See Burt v. Titlow, 571 U.S. ___, 134 S.Ct. 10, 17 (2013) ("[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.") (internal quotations and citations omitted). Moreover, even accepting as true the allegations that counsel failed to take adequate steps to contact Hector and that Hector could have testified as proffered, Petitioner has not established that Hector's testimony would have effectively impeached P.C., particularly in light of the corroboration of her testimony by the testimony of A.C., C.O. and Y.H. to similar acts. Strickland, 466 U.S. at 694 (prejudice requires a reasonable probability that the result of the proceeding would have been different absent the error, that is, "a probability sufficient to undermine confidence in the outcome.")

Finally, Petitioner alleges defense counsel should have obtained medical records of the victims, and that "defense counsel failed to get [an] expert's opinion as to [Petitioner's] character to commit the charged crimes, or an expert on DNA evidence, [or] an expert on sexual [sic] abused victims." (Id. at 17.) Such vague and conclusory

allegations are insufficient to prove that counsel provided ineffective assistance. Blackledge v. Allison, 431 U.S. 63, 74 (1977); see also James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (holding that conclusory allegations are insufficient to support granting habeas relief).

For the reasons set forth above, the Court finds that Petitioner's allegations do not satisfy the Strickland standard. See Richter, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686. As Petitioner points out (Traverse at 8), he seeks to relitigate the charges against him. Federal habeas functions is a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction. Richter, 562 U.S. at 102-03, quoting Jackson, 443 U.S. 332 n.5.

Accordingly, the Court finds, based on a de novo review, that Petitioner has not alleged facts which, if true, demonstrate he received constitutionally ineffective assistance of trial counsel. To the extent he alleges he received ineffective assistance of appellate counsel based on his appointed appellate counsel's failure to raise Claims 1 and 3 on direct appeal (see Traverse at 7), the claim is without merit because those claims are without merit. See Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (holding that where "trial counsel's performance, although not error-free, did not fall below the Strickland standard," no prejudice arose from appellate counsel's failure to challenge trial counsel's performance on appeal); Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance); Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable."); Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (holding that appellate counsel has no constitutional obligation to raise every nonfrivolous issue on appeal because "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of

1 | weaker issues is widely recognized as one of the hallmarks of effective appellate
2 | advocacy.")

3      An evidentiary hearing is not necessary where, as here, the federal claim can be
4 | denied on the basis of the state court record, and where the petitioner's allegations, even
5 | if true, do not provide a basis for habeas relief.  <u>Campbell</u>, 18 F.3d at 679.  Petitioner's
6 | allegations do not present an adequate factual basis supporting his claims sufficient to
7 | warrant an evidentiary hearing.  <u>See</u> <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1169 (9th Cir.
8 | 2005) (stating that a petitioner is entitled to an evidentiary hearing when he adequately
9 | proffered the factual basis of his claim, presented a colorable claim for relief, and did not
10 | previously receive a full and fair opportunity to develp the facts); <u>Landrigan</u>, 550 U.S.
11 | at 474 ("It follows that if the record . . . precludes habeas relief, a district court is not
12 | required to hold an evidentiary hearing.")

13 | **VI.**

14 | <u>**CONCLUSION AND RECOMMENDATION**</u>

15      For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the
16 | Court issue an Order: (1) approving and adopting this Report and Recommendation; and
17 | (2) directing that judgement be entered denying Petitioner's motions for appointment of
18 | counsel [ECF No. 14, 16], and denying the Petition.

19      **IT IS ORDERED** that no later than **<u>January 8, 2016</u>** any party to this action may
20 | file written objections with the Court and serve a copy on all parties.  The document
21 | should be captioned "Objections to Report and Recommendation."

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 |

-33-

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **January 29, 2016**.  The parties are  advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  December 18, 2015

Hon. Bernard G. Skomal
U.S. Magistrate Judge
United States District Court

-34-

15cv1226